[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiffs, Steven T. Miles and Cynthia M. Miles, bring this action alleging that the defendants, Nicasio Savona and Angela Savona, induced them, the Mileses, to purchase real estate at 3 South Ridge Road, Farmington, Connecticut, through false and fraudulent representations concerning the physical condition of the house and the accessory items located thereon.
The plaintiffs allege that they entered into a contract to purchase the defendants' house at 3 South Ridge Road, Farmington, on April 18, 1996; that, thereafter, they examined the property, discussed the condition of the property with the defendants, and questioned them generally and specifically regarding the property: its defects, problems and difficulties known to them. The responses by the defendants were consistently positive; that, the house had no problems or defects. That the house was in good condition.
The plaintiffs specifically contend that the defendants were asked about the heating and air conditioning systems; the water system, both interior and exterior; the electrical system and the security system; that the defendants assured the plaintiffs that the house throughout was in good condition when, in fact, they knew that defective conditions existed and failed to disclose them to the plaintiffs.
The plaintiffs also allege specifically that the following CT Page 16835 defective conditions existed, and the defendants failed to disclose these defects to the plaintiffs: a two-inch sag in the floor of the master bedroom; an inadequate heating system with water leaking from its piping; the well water system delivering water that was not potable and so acidic that it had corroded the piping within the house, causing leaks to develop; that the heating system was inadequate for the house and was not protected against winter freezes; that, the exterior of the house had "coins" that became displaced; gutters, facia and soffits were severely rotted and deteriorated, as were the columns at the front of the house; and, that the house security system was defective.
In addition, the plaintiffs contend that the defendants concealed a termite infestation in the basement, inoperative condition of electrical outlets in the basement and that garbage and other materials would be removed from the house and property. The plaintiffs contend that they purchased the said real estate without knowing of these defective conditions relying on the defendants' statements. The plaintiffs allege that they were forced to repair the above-mentioned defects to bring the house into that condition described by the defendants.
The defendants respond to the plaintiffs' allegations as follows:
That the defendants did not knowingly, falsely and fraudulently represent to the plaintiffs that the house was well built, that the construction had been performed in a high-quality manner with good sound materials, nor that the house was in 100 percent top condition.
In fact, the defendants pointed out to the plaintiffs defects in the house such as a water leak in the dining room, ceiling stains resulting from water leaks, both in the basement and from the attic heating equipment; that the security system was inoperative because of a broken light in an upstairs window; that the domestic water system included a filtering mechanism; and, that some of the exterior "coins" had cracks in the cement joints securing them in place.
As to the plaintiffs' claim of the existence of or concealment of a sag in the floor of the master bedroom, the defendants deny that there was any attempt to conceal or prevent examination of the flooring throughout the house. Further, the CT Page 16836 defendants did not observe or note or know of the claimed "sag" in the floor. Also, no indications were given by the plaintiffs' home inspector in his report to them that such a sag was present. He did, however, note a sloping of the front hallway and stressed that he could not give a definitive reason for its cause since the basement ceiling covered the area. However, he suggested that if the plaintiffs had any questions regarding this condition or its cause, they should consult with a knowledgeable carpenter or other professional. The plaintiffs did not follow through with his suggestion — at least up to the time of the closing on June 14, 1996.
The plaintiffs additionally claim that the defendants caused heating system leaks by failing to add antifreeze to the system. The defendants contend that they knew nothing about having antifreeze in the system; that, when a leak or freezing of pipes developed, plumbers were called to repair it; further, that they had so informed the plaintiffs.
Regarding plaintiffs' allegations that the defendants concealed the condition of or failed to disclose defects in the exterior brick, coins; gutter, facia and soffits, as well as the columns, the defendants contend that to the extent they were aware of any defects in the house they disclosed them to the plaintiffs; that, areas which were open and obvious as in these claimed defects, the plaintiffs had a full opportunity to examine and/or question the defendants about them. Further, the plaintiffs' home inspector made a full examination of the house and reported those defects that he found to the plaintiffs. No such defects as claimed by the plaintiffs were indicated in his report to the plaintiffs.
The security system was inoperative during the period prior to the closing date. The defendants indicated to the plaintiffs that a broken pane of glass in a window on the second floor disabled the system and had not been repaired and that this situation existed for several years. The plaintiffs made no attempt to have the system tested or checked out until after the closing. The plaintiffs have presented no evidence that the defendants attempted to withhold from the plaintiffs any knowledge they had of the system or to prevent the plaintiffs from having the system checked out prior to the closing.
Prior to the closing, the plaintiffs had the water from the well tested. That examination indicated a water contamination CT Page 16837 problem with a possible health hazard. The plaintiffs determined after checking with another water expert that although this water contamination was a health hazard, it could be overcome without difficulty. Nonetheless, the plaintiffs sought permission from the defendants to have another examination of the water. The defendant Nicasio angrily refused. He questioned whether the plaintiffs were implying that the defendants were placing themselves and their family in a situation hazardous to their health. He offered to terminate the sale agreement and return the plaintiffs' deposit. The plaintiffs refused defendants' offer and opted to proceed with closing the purchase without the additional water test. In fact, the plaintiffs had advanced the closing date by about a month and made no request to return to the previously scheduled later date for closing; thus indicating their satisfaction with their investigation of the house.
The defendants contend that by proceeding with the purchase the plaintiffs waived their claim for damages with regard to further water testing.
The court disagrees. Although the plaintiffs knew of the condition of the water as to potability, it raised an uncertainty as to whether other problems existed in the water. The defendants by not permitting the plaintiffs to examine the water again are responsible to the plaintiffs for the cost of correcting the water hardness condition even though it was discovered after the closing. The costs to correct the water hardness condition amounted to $1,484.00. There was an oral amendment to the sale/purchase agreement between the parties wherein the plaintiffs would remove the trash left behind by the defendants, and the defendants would reimburse this cost to the plaintiffs. These costs amounted to $500 for a dumpster, plus $200 for labor.
The legal issues raised by the plaintiffs in this action revolve around the defendants' responsibility as a seller of residential property to the plaintiff buyers of the property for defects discovered by the buyers after the sale.
The court finds that the plaintiffs had the opportunity to question the defendant sellers as to their knowledge of any defects, open or not observable, as well as to thoroughly examine and test the property for defects that were open, obvious and discoverable by a reasonably astute prospective buyer of real estate; and, to have professional advisors examine the property and to give their opinions to the plaintiffs. The plaintiffs took CT Page 16838 full advantage of opportunities to examine the property, to question the sellers and to receive professional assistance in arriving at their decision to purchase the defendants' property.
After plaintiffs purchased the premises and moved in, some defects became apparent or were greater than the plaintiffs had assumed, or had been overlooked by the plaintiffs; water pipes leaked; the security system required extensive repairs; rotted wood on columns and eves; the master bedroom floor had a sag; the well water was hard, etc. The plaintiffs had anticipated carrying out substantial renovations and had budgeted for these expenditures; however, these expenditures went way over budget because of the unanticipated repair costs that they seek to recover in this action.
The court finds, as to the plaintiffs' claims of defects, that the defendants misrepresented or were undiscoverable; that these were within the buyers' ability to discover by checking visually, asking questions of the sellers, or testing, as well as to have input from qualified experts. The plaintiffs were aware that they themselves did not have sufficient expertise to adequately determine the condition of the house or to determine certain defects, so they had a home inspection carried out with a written report prepared for them. (Exhibit B.) They also had a test made of the well water and discovered that the water was not potable (Exhibit 18A), but that this condition could be readily corrected. Further, the report by the home inspector found no deficiencies in the roof or eves (Exhibit B, pp. 9-10), nor in the columns or exterior brick and coins (Exhibit B, p. 10). He did, however, point out that the heating system boiler was operating at very high temperatures and pressure and recommended it be examined by a qualified technician (Exhibit B, p. 17).
Therefore, based upon the preceding discussion, evidence presented and findings by the court as well as the application of the law, the court determines that the plaintiffs failed to prove their allegations and finds for the defendants on these issues; except, however, on plaintiffs' allegation that defendants breached that aspect of the parties' agreement wherein the plaintiffs were to be allowed unfettered access to examine, test and question in their evaluation of the subject property, specifically, the well water. With regard to the defendants' refusal to permit the plaintiffs access to retest the well water, the court finds for the plaintiffs and assesses damages at $1,484.00. CT Page 16839
In addition, the court finds that the parties had agreed that the plaintiffs would recover their costs for removing and disposing of trash, etc., not removed by the defendants. The court finds for the plaintiffs on this allegation and assesses their damages at $700.00.
Therefore, judgment is to enter for the plaintiffs on the allegations in their complaint regarding failure of the defendants to permit access to test the well water, with damages of $1,484 due to plaintiffs from the defendants; and, for the plaintiffs on their allegation of damages for the defendants' refusal to pay their expenditure of $700 to remove and dispose of defendants' trash.
Thus, there is due to the plaintiffs and from the defendants, the total sum of $2,184.00.
Further, judgment may enter for the defendants and against the plaintiffs on all other allegations in the plaintiffs' complaint.
Judgment is to enter as above noted without costs to any of the parties.
Kremski, J.T.R.